IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TIFFANY MOSBY-GRANT | * | |
| Plaintiff | * | |
| v. | * | Civil No. L-07-1940 |
| CITY OF HAGERSTOWN | * | |
| Defendant | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM**

This in an employment discrimination case.  The plaintiff, Tiffany Mosby-Grant, was a recruit in the Western Maryland Police Academy's six-month training program.  She was dismissed from the program when she failed the handgun qualification test.  In her Title VII complaint, Mosby-Grant contends that the Academy subjected her to a hostile work environment, which impeded her ability to pass the test.  Following discovery, defendant, the City of Hagerstown, which operates the Academy, moved for summary judgment.  Because the briefs adequately address the issues, no hearing is necessary.  See Local Rule 105.6 (D. Md. 2008).  For the reasons stated herein, the motion will, by separate order, be GRANTED and the case dismissed.

I.    **INTRODUCTION**

Mosby-Grant's principal complaint is that after completing four and one half months of training, the Academy summarily dismissed her for failing the handgun proficiency test.  She ascribes her poor test results to (i) the Academy's failure to afford her sufficient training and

practice time, and (ii) stresses and distractions caused by a hostile work environment. This contention cannot withstand close examination, however.

As discussed at greater length below, the Academy requires all recruits to successfully complete a regimen of written examinations and proficiency tests in a wide range of subjects such as emergency vehicle driving and shooting. For most of the tests, the recruit is given multiple opportunities to pass. In accordance with Academy rules, however, all recruits are required to pass the handgun proficiency test on the day the test is given. With no exceptions, a failing grade requires expulsion.

Up until the handgun test, Mosby-Grant was performing well, and she had passed all of the preceding tests and examinations. She was, however, having some difficulty learning how to shoot a handgun. On practice rounds, she was shooting a passing score only 50 percent of the time. Although Mosby-Grant contends that she was not given adequate training and practice opportunities, the record contradicts this claim. Mosby-Grant was given more one-on-one instruction and practice time than any other recruit. Unfortunately, on the test day, she was only able to shoot one passing score on seven attempts, while three consecutive passing scores were required. Under the Academy's training and testing standards, the Academy was required to dismiss Mosby-Grant, which it did.

Moreover, as measured by the relevant case law, Mosby-Grant was not subjected to a hostile work environment during her tenure at the Academy. Mosby-Grant's claim must be measured against two groups of individuals, the instructional staff and her fellow recruits. The well-developed record demonstrates that the instructional staff, which was headed by a female director, Lieutenant Margaret Kline, treated Mosby-Grant professionally and provided her with encouragement and counseling. Plaintiff has few complaints to make about the staff.

Mosby-Grant's hostile work environment claim centers on the sometimes boorish behavior of her fellow recruits.  The training class consisted of 15 individuals, most of whom were young men in their early twenties.  Mosby-Grant was the only female and the sole African-American, although the record states that one of the young men was mixed race.

Early in the training program, the environment between Mosby-Grant and her fellow recruits was collegial.  As time progressed, however, she began to feel increasingly isolated and ignored.  Such feelings, however disheartening, do not constitute a hostile work environment. With few exceptions, her complaints involve instances of boorish or juvenile comments that were not directed at her, but which she overheard and found offensive.  Although she found the atmosphere offensive, the training academy simply did not exhibit the physical or verbal abusiveness, demeaning conduct, or permeating offensiveness that characterize a hostile work environment.  The anti-discrimination laws are not a civility code.  The Supreme Court has written that, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

Based on the record developed during discovery, no reasonable jury could find that Mosby-Grant was subjected to a hostile work environment or that her dismissal was discriminatory.  Accordingly, the City of Hagerstown is entitled to summary judgment.

## II.   FACTUAL BACKGROUND

### A.   Mosby-Grant's Acceptance to and Training at the Academy

In December 2005, the Academy accepted Mosby-Grant into its six-month training

program.[1]  The program began on January 9, 2006, and was scheduled to end July 14, 2006.

Sixteen recruits started the program but one of the white recruits withdrew from the Academy

during the first week of training, leaving a training class of fifteen.

At the beginning of training, each recruit, including Mosby-Grant, was issued the

"Missions, Goals and Standards" for the Academy (the "Student Handbook").  The Student

Handbook provides recruits with Academy rules and regulations and details the academic and

performance expectations.  Recruits were given multiple opportunities to pass all of the tests

save one.  For example, the Handbook states that recruits who do not pass a written exam may

retake the exam twice, recruits who do not pass a performance objective may be retested three

more times, recruits are allowed 24 attempts to pass each emergency vehicle operations course,

and recruits may pass the physical fitness component at any time, up to and including the day

before graduation.

Of significance to this case, the Student Handbook states that recruits must pass the

entrance level handgun training test on the designated qualification day.  Recruits are not given a

second chance; the Handbook recites that "[n]o student officer shall be retested on the failed

portion of handgun qualification.  Any student officer who fails to achieve the minimum scores

or fails to successfully meet the performance objectives and standards of the entrance-level

firearms training program will be dismissed from the academy." (Def. Ex. 10, ¶ 40-05-5.3).

---

[1] Some of the recruits were sponsored by law enforcement agencies, meaning that the agencies paid the recruit's tuition.  Others, including Mosby-Grant, were voluntary students and were required to pay the $2,900 tuition personally.  During her tenure, Mosby-Grant had difficulty making the required monthly tuition payments.

Mosby-Grant also received a copy of the Hagerstown Police Department's sexual harassment policy. This policy, among other things, defines sexual harassment, gives examples of sexual harassment, lays out a complaint procedure, and includes a harassment complaint form.

Four months into the course, Mosby-Grant had successfully completed all of the tests and assignments. On May 15, 2006, the recruits began two weeks of firearms training. At the outset, they were reminded that they must pass the handgun qualification test on the single qualification day or face dismissal. In order to pass the handgun test, the recruits were required to achieve three consecutive scores of 70% or better on the daylight course and one score of 70% or better on the low light course.

Prior to this firearms training, Mosby-Grant had no experience firing a weapon. Lieutenant Michael Lee King, administrator of the firearms training, observed that Mosby-Grant was experiencing problems common to new recruits. Specifically, she struggled with trigger slap, shot anticipation, grip, proper arm position, and improper use of a barricade. In response, Lieutenant King saw to it that a number of instructors worked with Mosby-Grant one-on-one to solve these problems.

In her complaint (Paper No. 1), Mosby-Grant alleges that she received less instruction than her fellow recruits. During her deposition, however, she stepped away from this claim as she was unable to identify any recruit who had received more instruction. Lieutenant King testified that Mosby-Grant received more handgun instruction than any other recruit he had ever seen.

Mosby-Grant also asserts in her complaint that she was not given adequate practice time. When questioned during her deposition, however, she was unable to identify any other recruit who received more. She also conceded that she received extra practice time because the firearm

instructors permitted her to stay at the firing line and continue practicing during scheduled breaks.[2]

Mosby-Grant's primary allegation centers on the weekend of May 20-21 that ended the first week of handgun training.  The Academy refused her request to take her handgun home so that she could practice over the weekend.  In making this decision, the Academy treated Mosby-Grant equally, as it refused all such requests.  During his deposition, Lieutenant King testified that recruits are not allowed to take their department-issued handguns off Academy grounds. Lieutenant King also explained that unsupervised practice is counter-productive as it leads to bad habits.  Lieutenant King advised Mosby-Grant to rest her hands and continue practicing her draw (one of her weaknesses) using a dummy gun.  Lieutenant King also attempted to build Mosby-Grant's confidence by telling her, "we will get you through this."  (Def. Ex. 5, p. 226, line 20; Pl. Ex. D, p. 27, lines 11–12).

During the second week of handgun training, Lieutenant King prepared the recruits by giving them full dress rehearsals of the actual tests.  Like the actual tests, the dress rehearsals were timed, meaning that the recruits were graded on speed as well as accuracy.  Mosby-Grant's "Recruit Range Training Record" shows that she was having difficulty mastering the required skills.  She shot 14 daylight practice qualification courses from May 18, 2006 through May 24, 2006.  She achieved only six passing scores, however.  She did better on the low-light practice courses, achieving a passing score on both of her attempts.

On May 25, 2006, the qualification day, the state-mandated time limits were strictly enforced and the instructors were not allowed to coach the recruits while they were firing. Mosby-Grant failed to achieve a passing score on her first four daylight courses.  Sensing that

---

[2] On deposition, Mosby-Grant also agreed that she received assistance with her equipment the day before qualification.  An instructor adjusted the sight on her handgun and held her holster and belt steady as she practiced her draw.

she was becoming flustered and making mistakes, the instructors took her aside before the fifth

course to give her time to compose herself and to give them an opportunity for last minute

instruction.  Afterwards, Mosby-Grant shot three more courses, achieving only one passing

score.  Thereafter, Mosby-Grant was dismissed from the Academy for failure to pass the required

handgun qualification test.

> **B.**      **Facts Relating to Hostile Work Environment Claims**

During Mosby-Grant's tenure at the Academy, she was not subjected to assaults,

demands for sexual favors, or racial epithets that characterize many hostile work environment

cases.  Rather, she points to a number of occasions when her fellow recruits acted in a manner

that she found offensive or made her feel excluded.  These instances, she contends, combined to

create a hostile work environment.  Under the law, a work environment is considered hostile if

an employee of reasonable fortitude would find the atmosphere abusive because of the severity

or frequency of the offensive incidents.  Accordingly, the Court will discuss these incidents

seriatim.

During domestic violence training in February 2006, Mosby-Grant overheard three or

four recruits complain that the material was boring.  She recalls them remarking, "why can't we

learn about something interesting," and "we have this shit again." (Def. Ex. 5, p. 242, lines 1–2).

Additionally, she heard the same recruits comment that women "cry this or that.  They call the

cops and they go back to the same guy who just beat them up." (Def. Ex. 5, p. 241, lines 18–21).

Although these remarks were not directed at Mosby-Grant, she was offended that other recruits

were belittling an important subject.  She complained to Lieutenant Kline, who responded that

"when they get out there, they're going to see it's not the same."  (Def. Ex. 5, p. 245, lines 16–

17).

At the end of February, during emergency vehicle driving training, Mosby-Grant observed other recruits snickering and laughing after she had run over some orange cones on the practice course. Although Mosby-Grant could not hear what the others were saying and cannot state for certain if they were laughing at her driving mistakes, she did not observe this behavior while other recruits were on the course. At one point, when Mosby-Grant was having difficulty driving a course, Detective Casey Yonkers, the driving instructor, made the other recruits wait in a trailer with the blinds closed because he believed that they were making her nervous.

On deposition, Mosby-Grant recounted a conversation during which Yonkers shared his impression that the other recruits were excluding her. They were, he complained, demonstrating the "worst team-effort support" he had ever seen. (Def. Ex. 5, p. 168, lines 16–17). Detective Yonkers stated that he would speak with Lieutenant Kline about the class's behavior. The record does not disclose whether Yonkers followed up, however. Despite these problems, Mosby-Grant passed all segments of the driving course.

Once, while the recruits were on break, Mosby-Grant overheard Recruit X[3] comment that pop singer Britney Spears was "ghetto." (Def. Ex. 5, p. 265, line 1). When Mosby-Grant asked what Recruit X meant by that comment, he replied "she's white, dirty, nasty white trash. She's nasty and she's white trash." (Def. Ex. 5, p. 265, lines 3–4). When Mosby-Grant asked him whether "ghetto" referred to "socio-economic conditions" or "affiliations," he responded that "people in situations of poverty choose to live in poverty. They don't need to live like that." (Def. Ex. 5, p. 265, lines 6–18). During the same conversation, Recruit X stated that homeless people who frequent the library should be kicked out because of their body odor. Mosby-Grant informed Lieutenant Kline of this conversation.

---

[3] In this opinion, the Court has redacted the names of the recruits.

During a physical training exercise in April 2006, the recruits raced one-against-one to pick up a ball at the other end of the gymnasium.  Mosby-Grant was paired against Recruit X.  After reaching the ball before Recruit X, Mosby-Grant picked it up.  Recruit X snatched the ball from Mosby-Grant's grasp, scratching her wrist in the process, and causing her to exclaim, "calm the fuck down."  (Def. Ex. 14, p. 5).  Seeing this, the supervising officer ordered Recruit X to sit out the remainder of the exercise.

On a different occasion in April, after a class had been cancelled, Recruit R, the class sergeant,[4] held an impromptu team meeting to discuss "being a team and any issues." (Def. Ex. 5, p. 285, lines 7–8).  The first issue that the class discussed was a disagreement between Recruits D and N.  According to Mosby-Grant, the discussion then turned to criticisms of her and her performance.  Mosby-Grant alleges that various members of the group[5] embarrassed her by addressing her nonconforming uniform,[6] her nonconforming hair,[7] her periodic tardiness to class,[8] her lack of participation in group activities,[9] and the aforementioned physical training incident with Recruit X.  As described below in the footnotes, Mosby-Grant's uniform and hairstyle did violate the regulations, and she had, in fact, been periodically late to class.  What

---

[4] Recruit R served as class sergeant.  As class sergeant, he was responsible for basic inspections, reporting absent or tardy recruits to the supervisors, and flag duty.

[5] She only recalls Recruit D, Recruit R, Recruit S, Recruit V, and Recruit X participating in this portion of the discussion.

[6] Uniform trousers provided by the Academy were solid color.  These trousers did not fit Mosby-Grant properly so Lieutenant Kline loaned her a pair of uniform trousers to wear until properly fitting standard uniform trousers could be acquired.  The loaned trousers had a stripe down the side with which some of the recruits took issue.

[7] The Student Handbook stated that women should wear their hair "in a style which prevents any hair from extending down the bottom of the edge of the shirt collar."  During Mosby-Grant's training, Lieutenant Kline told her that the Hagerstown Police Department had changed its policy to allow ponytails that hang below the collar and that she could wear her hair in this style.  Mosby-Grant thereafter proceeded to wear her hair in a ponytail.

[8] On several occasions Mosby-Grant was tardy to class due to her efforts to secure financial assistance.  Lieutenant Kline was aware of these instances, but Mosby-Grant did not inform class sergeant Recruit R when or why she was going to be tardy.

[9] In response to questions regarding her lack of participation in group activities, Mosby-Grant replied that "I don't engage in conversation that is not uplifting . . . . I don't gossip about people."  Mosby-Grant also testified that she did not participate in group basketball or soccer because she did not like the manner in which other recruits played the games.

the class did not know is that Lieutenant Kline had approved each of these three

nonconformities.

Mosby-Grant subsequently complained to Lieutenant Kline that she had been ambushed

at the team meeting.  Kline responded that she would start enforcing the dress code more strictly

as others had also been out of compliance.  During this conversation, Mosby-Grant stated that

while she did not know whether the cause involved her race or gender, she had been singled out

and treated differently.  Kline promised to look into the matter but never reported back to

Mosby-Grant.

In early May, the recruits participated in an exercise to train them to identify the indicia

of intoxication.  To heighten realism, faculty and outside volunteers, including Lieutenant King,

the firearms instructor, agreed to become inebriated.  The recruits were placed at different

stations.  The volunteers moved from station to station, where the recruits administered field

sobriety tests.  When Mosby-Grant tested Lieutenant King, he neither said nor did anything that

could be characterized as offensive.  Later, however, after Lieutenant King had moved to a

different station, Mosby-Grant overheard King refer loudly to another recruit as a "pussy." (Def.

Ex. 5, p. 208, lines 18–21; p. 209, lines 1–3).  Mosby-Grant was offended by the reference, and

the next day she complained to Lieutenant Kline.

Also in early May, Lieutenant Kline informed Mosby-Grant that Capitan Moulton was

trying to have Mosby-Grant expelled from the Academy for failure to pay tuition.  Lieutenant

Kline assured Mosby-Grant that she would not allow this to happen because other recruits

"[were] in the same position." (Def. Ex. 5, p. 94, lines 15–16).

During handgun training in early May, Mosby-Grant overheard Recruit R (a Caucasian)

say to Recruit G (mixed race) that "where I'm from people like you are strung up from a

flagpole." (Def. Ex. 5, p. 248, lines 10–12).  Recruit R also mentioned dragging people behind a truck.[10]  The record indicates that Recruit R and Recruit G were friends engaging in banter and that, despite the surface offensiveness of the remarks, no actual offense was meant or taken.

Hearing the remarks, Mosby-Grant objected and told Recruit R that she would speak to him about it later.  After the class had ended, Mosby-Grant explained to Recruit R that she found the remarks offensive and she was surprised that he would make such ill-considered comments.  Recruit R promptly apologized and stated that he understood why she was upset.  Mosby-Grant did not inform Lieutenant Kline about this incident.

On the handgun qualification day (May 25, 2006), most of the recruits stood around while others were taking their tests.  Although her testimony on this point is vague, Mosby-Grant stated that at least once during her qualification attempts she could hear her fellow recruits laughing and talking.  Although she found this distracting, she could not hear what they were saying, and she cannot allege that they were trying to distract or make fun of her.

The incidents discussed above can be assigned an approximate date.  The record does not pinpoint when the following incidents occurred.

On approximately ten occasions Mosby-Grant overheard the term "bitch," which she considers highly offensive.  Most of the time, she heard the term used in casual conversation, and she cannot recall the context.  On one occasion, a detective, while leading a training exercise, recounted an unpleasant on-duty encounter with a woman whom he described as a "bitch."  On another occasion, Mosby-Grant, who was playing the role of a hostage taker, collided with the same detective in a dark basement.  Afterward, while discussing the exercise, the detective

---

[10] Although Recruit R testified on deposition that he recalled joking about race with Recruit G, Recruit R could not remember the exact remarks he made.

recounted, "I saw her, and it was like this bitch . . . ."  Mosby-Grant was offended by the term, but did not report the incident to her supervisors.

From time to time, Mosby-Grant and another recruit (Recruit N) rode together to and from training.  On an unspecified date, while they were driving, Recruit N said that another recruit had had a sexual encounter with a 16-year-old girl.  On deposition, Mosby-Grant testified that she was offended by the recruit's conduct, but that she was not offended by Recruit N's telling her about this incident.  This topic was the subject of conversation among the recruits for a time, but Mosby-Grant does not contend that she found these conversations to be harassing or that the other recruits disparaged the girl.

On approximately five to ten occasions, Mosby-Grant overheard recruits discussing a one-legged woman who was frequently seen around the Hagerstown Days Inn.  The woman appeared to be on drugs and the recruits sometimes referred to her as a "dope fiend." (Def. Ex. 5, p. 199, line 15).   The recruits made passing references to the woman as a suspected "prostitute" (Def. Ex. 5, p. 199, line 17) and they joked that one of the recruits, who was staying at the motel during the program, might have "got with her." (Def. Ex. 5, p. 198, line 16–17).  Mosby-Grant found the term "dope fiend" as applied to a woman to be offensive, and she disliked the line of conversation.  She informed Lieutenant Kline that the recruits had made fun of people with missing limbs.

On at least ten occasions Mosby-Grant overheard various recruits commenting on women's appearances.  These comments were made on and off Academy property.  Mosby-Grant does not specify what comments were made, and she cannot recall whether any of the instructors overheard the comments or if she discussed them with Lieutenant Kline.

On several occasions Mosby-Grant overheard recruits[11] discussing pornographic

materials.  A few mentioned films they enjoyed and recommended.  A few recruits mentioned

bringing materials to the Academy to exchange with others.  No recruit ever talked directly to

Mosby-Grant about or showed her any pornographic material.  She does not contend that what

she overheard was graphic or detailed.  Mosby-Grant did not bring these incidents to Lieutenant

Kline's attention.

On an unspecified number of occasions Mosby-Grant overheard the use of the words

"honky," "cracker," and "fucking Mexicans." (Def. Ex. 5, p. 246, line 11).  On one occasion,

Recruit S referred to a car full of people by saying "they're packing that car like a bunch of

fucking Mexicans." (Def. Ex. 5, p. 251, line 21; p. 252, lines 1–2).  On another occasion, when

Recruit S was teased that his mustache looked like a "porno stash," he responded, "you look like

a fucking Mexican with your mustache like that." (Def. Ex. 5, p. 252, lines 4–12).  Again, these

comments were not directed at Mosby-Grant, but they made her uncomfortable.  Mosby-Grant

did not recall advising her supervisors about these comments or whether any supervisor

overheard the recruits use such language.

On an unspecified number of occasions, Mosby-Grant heard recruits singing a song by

the rap group Three 6 Mafia called "Asses, Titties and Big Booty Bitches." (Def. Ex. 5, p. 256,

lines 8–9).  This song was not sung as a cadence during official training activities.  Some recruits

would, however, occasionally sing the song before classes or during breaks.  Mosby-Grant was

offended by this song but she did not complain to her supervisors.

Mosby-Grant testified on deposition that initially the training program environment was

collegial.  As time progressed, however, she began to feel increasingly excluded from the recruit

---

[11] Mosby-Grant recalled on deposition that only four or five recruits, and not the entire class, discussed pornographic materials.

class.  Mosby-Grant alleged in her complaint that she was "made to feel like an outsider and

shunned by others at the Academy."  (Paper No. 1, p. 2).  Specifically, Mosby-Grant contends

that her classmates ignored her, never volunteered to be her partner, or would not place their

hands on hers during the morning huddle.[12]  Despite this, Mosby-Grant did, however, have

friends in the recruit class, including Recruit N and Recruit R.

## II.    STANDARD OF REVIEW

The City of Hagerstown has moved for summary judgment.[13]  The Court may grant

summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);

Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); see also Felty v. Graves-Humphreys Co.,

818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative

obligation" to prevent factually unsupported claims and defenses from proceeding to trial).

Nevertheless, in determining whether there is a genuine issue of material fact, the Court views

the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the

non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

## III.    ANALYSIS

Title VII states that it is an "unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race . . . [or] sex . . . ."  42 U.S.C. §

2000e-2(a)(1).  Because an employee's work environment is considered a term or condition of

---

[12] On occasions when she specifically asked a recruit to be her partner, however, no recruit refused her request.

[13] Mosby-Grant has not briefed the issue of recovery of punitive damages from the City of Hagerstown.  In any event, 42 U.S.C. § 1981a(b)(1) bars the recovery of punitive damages for violations of Title VII by a "government, government agency or political subdivision."

employment, Title VII provides a hostile work environment cause of action.  Meritor Savings

Bank, FSB v. Vinson, 477 U.S. 57, 73 (1986); EEOC v. Central Wholesalers, Inc., 573 F.3d 167,

174 (4th Cir. 2009).  Title VII also extends this protection to trainees.  42 U.S.C. § 2000e-2(d)

("It shall be an unlawful employment practice for any employer . . . controlling . . . training or

retraining . . . to discriminate against any individual because of his race . . . [or] sex . . . [in] any

program established to provide . . . training.").

     In order to make out a *prima facie* case for a gender or race-based hostile work

environment harassment claim under Title VII, Mosby-Grant must demonstrate that the

harassment was (1) unwelcome, (2) based on her gender and/or race, (3) sufficiently severe or

pervasive as to alter her working conditions and/or create an abusive atmosphere, and (4) that

there is some basis for imposing or imputing liability on the defendant.  See Spriggs v. Diamond

Auto Glass, 242 F.3d 179, 183–84 (4th Cir. 2001); Smith v. First Union Nat'l Bank, 202 F.3d

234, 241 (4th Cir. 2000).

     Mosby-Grant, who complained to Lieutenant Kline from time to time about her

classmates' behavior, meets the "unwelcomeness" prong of the test.  She fails to satisfy the

second and third prongs.  Proceeding to the weakest part of her case, the Court finds that Mosby-

Grant has failed to produce evidence sufficient to persuade a reasonable juror that the conduct of

which she complains was sufficiently severe or pervasive to constitute a hostile work

environment.

     In evaluating whether alleged harassment is severe and pervasive, the Court must

consider the totality of the circumstances, including (1) the frequency of the discriminatory

conduct, (2) its severity, (3) whether it is physically threatening or humiliating, as opposed to a

15

mere offensive utterance, and (4) whether it unreasonably interferes with an employee's work

performance.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993); Smith, 202 F.3d at 242.

The case law provides guidance in applying the test.  In gender discrimination cases,

physical intimidation or demands for sex are classic examples of harassment, but they are not

indispensable.  Women may be subjected to gender-based harassment in the workplace without

being exposed to sexual advances or propositions.  Ocheltree v. Scollon Productions, Inc., 335

F.3d 325, 331 (4th Cir. 2003).  For example, in Ocheltree, the Fourth Circuit observed that "a

jury could reasonably find that the men engaged in [sexually explicit songs, language, and

demonstrations with mannequins] largely because they enjoyed watching and laughing at the

reactions of the only woman in the shop."  Ocheltree, 335 F.3d at 332.  Thus, overheard or

observed language or conduct must also be considered in determining the overall environment in

which the plaintiff worked.  See Spriggs, 242 F.3d at 184.

The courts have commented that Title VII does not "provide a remedy for every instance

of verbal or physical harassment in the workplace," Lissau v. Southern Food Serv. Inc., 159 F.3d

177, 183 (4th Cir. 1998), and that "simple teasing, offhand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory changes in the terms and conditions

of employment," Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Because of this,

"relief is unavailable where the alleged conduct 'is not severe or pervasive enough to create an

objectively hostile or abusive work environment' or where the victim 'does not subjectively

perceive the environment to be abusive.'"  Lissau, 159 F.3d at 182 (quoting Harris, 510 U.S. at

21).

Mosby-Grant subjectively believes that her work environment was abusive and/or hostile.

The dispositive issue in this case turns on whether, objectively, a reasonable juror could find that

the conduct to which Mosby-Grant was subjected was severe and pervasive enough to be considered an abusive or hostile work environment.  This question must be answered in the negative.  See Faragher, 524 U.S. at 787 (citing Harris, 510 U.S. at 21–22).

One must bear in mind that the behavior complained of was spread out over a four-month period.  Viewed in context, the offensive behavior was not frequent and was not intended to elicit a reaction from Mosby-Grant.[14]

The conduct Mosby-Grant complains of also cannot be regarded as severe.  Most of her allegations concern the type of random, offhand, off-color comments that regrettably serve as background noise in today's culture.  Even the more glaring incidents are softened in context.  The most offensive comment in the record was Recruit R's remark that "where I'm from people like you are strung up from a flagpole" and his reference to dragging people like you behind a truck.  Both comments are patently offensive.  Nevertheless, Recruit R made them while bantering with one of his friends.  The comments were not directed at Mosby-Grant, who merely overheard the conversation.  Moreover, Recruit R immediately apologized and stated that he appreciated why Mosby-Grant would find the banter offensive.

The next most offensive incident occurred after an exercise when a faculty member referred to Mosby-Grant, who had played the role of a hostage-taker, as the "bitch" with whom he had collided.  The use of the word must be placed in the context of the exercise, and nothing suggests that that the faculty member was making a derogatory remark about Mosby-Grant as a person rather than Mosby-Grant as a hostage taker.  Likewise, the references to "fucking Mexicans," while undeniably offensive, were not directed at Mosby-Grant, who is African-American, and occurred only twice during her training.

---

[14] In comparison, the facts of Ocheltree indicate that the plaintiff's co-workers went out of their way to offend her. See Ocheltree, 335 F.3d at 332–33.  The record in the instant case does not reasonably support a similar conclusion.

The impromptu team meeting did not involve coarse behavior or offensive language. Nevertheless, Mosby-Grant believes that her fellow recruits singled her out for undue criticism. This single incident is not actionable.  First, it was the only time when the other recruits criticized her or her performance.  Second, the criticisms were valid as Mosby-Grant's uniform and hair style did not conform to the Student Handbook requirements, and she had, in fact, been noticeably tardy to class.  The other recruits were unaware that Lieutenant Kline had permitted these discrepancies, however.  Certainly, the other recruits could have handled the situation with more tact, but the anti-discrimination laws do not outlaw mere tactlessness.  The laws also do not require co-workers to be collegial and sensitive to the needs of others.

In sum, based on the totality of the circumstances experienced by Mosby-Grant at the Academy and reflected in the record, no reasonable juror could conclude that the conduct was severe and pervasive enough to constitute an abusive or hostile work environment.

IV.    CONCLUSION

For the foregoing reasons, the Court will, by separate order, GRANT the City of Hagerstown's Motion for Summary Judgment.


Dated this 29th day of September 2009.

        /s/        

Benson Everett Legg
Chief Judge
